UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Gary Arlon Remick**

    **v.**                                Case No. 10-cv-578-PB
                                         Opinion No. 2011 DNH 176

**Michael J. Astrue, Commissioner,**
**Social Security Administration**

**MEMORANDUM AND ORDER**

    Gary Arlon Remick filed a complaint, pursuant to 42 U.S.C. § 405(g), seeking judicial review of the decision of the Commissioner denying his application for supplemental social security benefits.  Remick contends that the Administrative Law Judge ("ALJ") failed to consider the combined effect of Remick's impairments in determining his residual functional capacity ("RFC"), and gave insufficient weight to the opinion of Remick's treating physician, Dr. Sebastian Strobel.  The Commissioner moves to affirm the decision.  For the reasons provided below, I affirm the Commissioner's decision.

**I.  BACKGROUND**[1]

    Remick applied for supplemental social security benefits on April 9, 2008, when he was fifty years old.  He alleged an

---

[1] The background information is taken from the parties' Joint Statement of Material Facts.  See L.R. 9.1(b).  Citations to the Administrative Transcript are indicated by "Tr."

inability to work as of February 18, 2008, due to multiple
impairments, including diabetes mellitus,[2] atrial fibrillation,[3]
neurogenic bladder,[4] dysthymic disorder,[5] and anxiety disorder.[6]
He completed the tenth grade of high school, and in the past, he
worked as a custodian in a school system and as a laborer in a
lumber yard.

A.    **Medical History**

      Remick was hospitalized on February 18, 2008, following a
visit to the emergency room at the Dartmouth Hitchcock Medical
Center ("DHMC"), where he requested alcohol detoxification.
Upon discharge on March 5, 2008, the primary diagnoses were:
diabetes mellitus, atrial fibrillation, alcohol detoxification,
and urinary retention from either bladder outlet obstruction or

---

[2] Diabetes mellitus is "a chronic metabolic disorder in which the
use of carbohydrate is impaired and that of lipid and protein
enhanced.  It is caused by an absolute or relative deficiency of
insulin . . . ." Stedman's Medical Dictionary at 529 (28th ed.
2006) ("Stedman's").

[3] Atrial fibrillation is "[v]ermicular twitching . . . of
individual muscular fibers . . . in which the normal rhythmic
contractions of the cardiac atria are replaced by rapid
irregular twitchings of the muscular wall . . . ." Stedman's at
722-23.

[4] Neurogenic bladder is "any defective functioning of bladder due
to impaired innervation . . . ." Stedman's at 226.

[5] Dysthymic disorder is "a chronic disturbance of mood
characterized by mild depression or loss of interest in usual
activities." Stedman's at 569.

[6] Anxiety disorder is characterized by "chronic, repeated
episodes of anxiety reactions." Stedman's at 569.

urinary tract infection ("UTI").  During this admission, he was placed on insulin, and at the time of discharge, his glucose was well controlled.  He also began taking diltiazem, a medication for atrial fibrillation.  Lastly, a catheter was inserted to address urinary retention and he was taught to straight-catheterize.

### 1.   Atrial Fibrillation

On March 11, 2008, at a first doctor's visit following his hospitalization, Remick reported that he had not noticed problems with his heart rate being too fast or slow.  Dr. Dhaval Parikh, who saw Remick on April 17, 2008 at the DHMC, noted that at that time, Remick was completely asymptomatic with atrial fibrillation and that his heart rate was mostly controlled. During a May 19, 2008 visit with Dr. Strobel, Remick's primary care provider, no cardiovascular symptoms were noted.  The assessment was that Remick's atrial fibrillation rate was controlled.  The only symptom noted was gravity dependent edema in the afternoon, most likely from diltiazem.  At a subsequent visit, on July 16, 2008, Remick again reported no difficulties with his heart and no chest pain, but reported that he still had lower extremity edema that would be gone in the morning, and that while exercising he experienced shortness of breath.  Dr. Strobel indicated that Remick did a lot of walking.  Dr. Strobel also noted that on June 13, 2008, while following a Bruce

protocol,[7] Remick had to stop because of fatigue, the target rate was not reached, and Remick developed atrial flutter[8] during recovery.  A Holter monitor[9] test was performed on August 18, 2008.  The physician's interpretation was periods of normal sinus rhythm with multiple episodes of fibrillation, flutter, and supraventricular tachycardia[10].

In a subsequent visit with Dr. Strobel on August 26, 2008, Remick's heart rate was normal and there was no edema in his extremities.  There was a follow-up cardiology visit on August 27, 2008, during which Remick reported that he continued to go for walks and expressed no functional limitations.  On October 15, 2008, Dr. Strobel again found that Remick's heart rate was well controlled.  Upon examination, there was no edema in his extremities.  During the next visit, on January 21, 2009, Remick reported to Dr. Strobel that he was exercising well and had

---

[7] Bruce protocol is "a standardized protocol for electrocardiogram-monitored exercise using increasing speeds and elevations of the treadmill."  Stedman's at 1584.

[8] Atrial flutter is characterized by "rapid regular atrial contractions occurring usually at rates between 250 and 330 per minute . . . ."  Stedman's at 749.

[9] Holter monitor is "a technique for long-term, continuous[,] usually ambulatory, recording of electrocardiographic signals on magnetic tape for scanning and selection of significant but fleeting changes that might otherwise escape notice."  Stedman's at 1222.

[10] Tachycardia is "[r]apid beating of the heart, conventionally applied to rates over 90 beats per minute."  Stedman's at 1931. Supraventricular tachycardia occurs "anywhere above the ventricular level, i.e., sinus node, atrium, atrioventricular junction."  Id.

decreased leg swelling.  Dr. Strobel again noted that there was no edema in his extremities and that his heart rate was well controlled.  On the same date, Dr. Grossman reported that Remick was exercising without difficulty and that he was not experiencing shortness of breath.

When Dr. Strobel saw Remick on May 13, 2009, Remick reported swelling in his right leg, especially at night.  Dr. Strobel found that his heart rate seemed to be well controlled but that Remick was flipping in and out of fibrillation and flutter.  During a cardiology visit on June 3, 2009, Remick reported that he had more dependent edema over the past year and that although his legs were usually free of fluid in the morning, the fluid accumulated progressively during the day. The assessment was that his ventricular responses to atrial arrhythmias appeared to be well controlled, and that the swelling was related to diltiazem.

Remick saw Dr. Strobel again on July 21, 2009 and reported that he was "okay" on metoprolol and diltiazem, the two atrial fibrillation prescriptions he was taking, and that he had less swelling in his ankles.  At follow-up visits on October 16, 2009, November 3, 2009, January 15, 2010, and March 5, 2010, Dr. Strobel noted that Remick's heart rate continued to be well controlled and that there was no edema in his extremities.

## 2.   **Bladder Dysfunction**

During his March 11, 2008 visit at the DHMC, Remick reported straight-catheterizing every three hours to address his bladder dysfunction.  At a subsequent visit, on April 17, 2008, a urodynamic study showed that he had atonic bladder with impaired sensation and the resulting treatment plan was to continue to cath often enough to keep his urine volume under 500 cc.  The diagnosis was confirmed in a GI/Hepatology consultation on May 6, 2008.

On May 19, 2008, Dr. Strobel noted that Remick had to cath himself every three hours.  Although there was no burning or pain, Dr. Strobel intended to contact urology for alternatives to straight-catheterization.  That same day, Dr. Eisenberg, in consultation with Dr. Strobel, noted that Remick was experiencing fatigue and sleep interruption due to having to use a catheter.  Remick told Dr. Strobel on his next visit on July 16, 2008, that he felt tired from the straight-catheterization, as it was interrupting his sleep.  There was again no burning or blood in the urine.

On December 31, 2008, Remick had a UTI which caused a large blood clot.  A report culture performed on January 2, 2009, showed that the infection was gone.  As of January 21, 2009, Remick reported cathing approximately every 4 hours, that his urine volume was rarely over 500 cc, that he did not void at all

on his own, and that he had no difficulties cathing.  The same was reported during a urology consultation on July 21, 2009.  At that time, Dr. Gromley, a urologist, did not recommend any alternatives to cathing.

On October 1, 2009, Remick was treated for another UTI. His physicians noted that he had not retained bladder function and that he had experienced two to three UTIs.  Improvement was noted on November 3, 2009, when Dr. Strobel stated that Remick was having less frequent UTIs.  On March 5, 2010, the date of his last visit addressing the condition, Remick reported using a catheter every four hours and had no further UTIs.

### 3.  Diabetes

On March 11, 2008, at a follow-up visit to his hospitalization, Remick's diabetes was under control with insulin.  He reported feeling a little shaky on two to four occasions.  On March 26, 2008, his medication for diabetes was adjusted based on a report that he had gone to the emergency room for hypoglycemia.  Remick then went to the Diabetes Clinic for diabetes patient education on April 3, 2008, April 18, 2008, May 23, 2008, July 17, 2008, and October 3, 2008.  A barrier to diabetes education learning was identified as a cognitive issue.

Dr. Strobel noted following a May 19, 2008 visit that Remick's diabetes was well controlled.  On July 16, 2008, however, Remick reported to Dr. Strobel that his blood sugar was

7

poorly controlled and that sometimes he "cheat[ed]" by eating cake.  At a subsequent visit, on August 26, 2008, Dr. Strobel noted that Remick's blood sugar was still not well controlled and increased his insulin regimen.  On October 15, 2008, Dr. Strobel found that his diabetes seemed to be better controlled with the new regimen.  Improvement was again noted on January 21, 2009, when Remick reported no hypoglycemia episodes and Dr. Strobel stated that his diabetes was well controlled.  Dr. Strobel did not address Remick's diabetes again until October 16, 2009, when he noted that Remick stopped taking the noon dosage of insulin because he had experienced an episode of hypoglycemia.  At a follow-up visit on November 3, 2009, Remick reported that his sugars were doing "ok."  On March 5, 2010, at the last visit addressing diabetes, Dr. Strobel noted that Remick's diabetes showed improvement on a stricter diet.

### 4.  **Depression**

On February 21, 2008, Remick underwent a psychiatric consultation due to depressive symptoms contributing to an increased alcohol intake.  A mental status examination revealed Remick to be cooperative, and he reported feeling good at the moment.  Although his speech was slurred at times, Remick spoke at a normal volume and rate.  His affect was full, thought process was goal directed and linear, cognition was alert and oriented, insight was good, and judgment was good.  No treatment

for depressive symptoms was recommended at that time, but the consult recommended reevaluating Remick's mood when he reached one month of sobriety to determine if there was an underlying mood disorder.

Remick made no reports of sadness, depression, or anxiety to Dr. Strobel until August 6, 2008, when he presented a letter from his counselor stating that he was very depressed and that they had talked about antidepressant therapy.  Remick reported that he was not refreshed in the morning and that he experienced a loss of energy.  Dr. Strobel started him on citalopram for depression.  Dr. Medora discussed with Dr. Strobel that day that Remick was presenting with symptoms of major depressive disorder.

When Dr. Strobel saw Remick again on August 26, 2008, he reported that he was sleepy and had no energy.  Dr. Strobel changed the depression medication to Prozac because of the sedative effect of citalopram.  On October 15, 2008, Dr. Strobel continued the medication for depression, which seemed to help, although Remick reported he was still sleepy but more energetic. During a visit on January 21, 2009, Dr. Strobel noted that Prozac was working well for the depression and that Remick had finished Alcoholics Anonymous ("AA") counseling.  On May 13, 2009, Dr. Strobel again noted that Remick's mood had improved.

At a subsequent visit, on July 21, 2009, Remick reported
that his mood had been unstable in the prior couple of weeks.
On November 3, 2009, however, Dr. Strobel noted that Remick's
depression was mild and that mild irritability persisted.
Remick reported that, overall, his depression had improved and
that only afternoon irritability bothered him.  During follow-up
visits on January 15, 2010 and March 5, 2010, Dr. Strobel again
noted that Remick's depression had improved.

### 5.   __Functional Capacity Exam__

Dr. Strobel referred Remick for a functional capacity exam,
which Remick completed on August 20, 2009, with David Minshall,
a physical therapist.  During the evaluation, Remick was able to
work continuously for five hours without much need for rest.  He
rated the functional capacity exam as fairly light to somewhat
hard when compared with his daily activities, which he rated as
very hard work.  Based on his observations of muscle tension,
body mechanics, movement patterns, and competitive test
performance, Minshall concluded that Remick had not reached his
physical maximum during the evaluation.

Minshall also noted that Remick was not fully reliable in
his disability reporting.  The self-report functional outcome
scales demonstrated that Remick rated himself as low-
functioning.  He was relatively accurate about his ability to
lift approximately 25 pounds, but underestimated his reported

10

sitting tolerance of 10 minutes and standing tolerance of 30 minutes.  Remick was able to sit for 155 minutes and stand for 122 minutes with a five-minute break during the standing. Remick did not appear uncomfortable, as he did not shift his weight considerably during the sitting or standing tasks.

Although Remick's actual physical strength may have been greater than he demonstrated, Minshall opined that the results of the evaluation gave a reasonable estimate of his capacity to dependably sustain performance in the workplace.  He found, overall, Remick performed at a full-sedentary and into the light-physical demand level in most lifting levels, and that he could not return to his previous work.  With some physical conditioning and body mechanic training, Minshall opined that Remick would likely be able to progress into the full-light physical demand level.  Further, he found that Remick could tolerate part-time work based upon the functional capacity evaluation, where he performed five hours of activity.  The recommendation was vocational rehabilitation, work-hardening pending medical clearance, and, after work-hardening, returning to work on a part-time basis and increasing work hours as tolerated.

On May 7, 2010, Dr. Strobel reviewed the functional capacity evaluation and concurred with the findings in the report.  Dr. Strobel wrote that Remick's combination of

11

diabetes, depression, and urinary retention, with the need to straight-catheterize every four hours, limited his ability to work, especially as his sleep was interrupted by the catheter use.  Dr. Strobel concluded that Remick could only work part-time.  Following a discussion with Dr. Strobel that day regarding Remick's medical care, Dr. Herndon wrote that, based on Remick's diabetes, atrial fibrillation, and depression, Dr. Strobel did not think that Remick was able to perform full-time work.

**B.   Psychological Evaluations**

The Social Security Administration sent Remick to a consultative examination with a psychologist, Anna Hutton, Psy.D., in June of 2008.  Dr. Hutton diagnosed Remick with a history of alcohol abuse and alcohol dependence, dysthymic disorder, and generalized anxiety disorder.  Dr. Hutton noted that Remick's symptoms of depression and anxiety had been problematic prior to the onset of his alcohol abuse.  She noted that Remick was well-groomed and that his speech was clear, spontaneous, and logical.  Remick's mood was positive, and he presented with a calm demeanor.  He had a generally positive and bright affect.  He did not demonstrate any loose associations, delusions, misinterpretations, preoccupations, obsessions, or phobic ideas.  He denied homicidal and suicidal ideation.

Dr. Hutton noted that Remick was generally independent in matters of personal affairs.  He was able to conduct shopping activities with a list, cook, and take public transportation. He completed his daily household chores and activities in combination with his partner.

Dr. Hutton also stated that Remick generally had good memory of dates and good recall for personal information, but that he complained of memory loss, including that he often forgot to take his medication, that he had to write everything down, and that he would forget conversations he just had and the names of people with whom he was generally familiar.  Dr. Hutton noted that Remick's working memory skills and attentional skills were below average.  She stated that his ability to focus on work-related tasks might be somewhat impaired but should not completely prohibit his ability to function in a work setting. Dr. Hutton opined that Remick would have difficulty recalling novel instructions or novel information, but his ability to understand the same was within normal limits.  She further opined that Remick could interact appropriately and communicate effectively with others, would not have significant difficulty making decisions in a work environment, should be able to maintain attendance and schedules in a work environment, and should be able to interact appropriately with supervisors.

Craig Stenslie, Ph.D., reviewed the evidence of record gathered by the Social Security Administration as of July 15, 2008, including Dr. Hutton's evaluation.  Dr. Stenslie opined that Remick was able to: deal adequately with short and simple instructions, but would need help with complexities; maintain attention for two hours and sustain an ordinary work routine without special supervision; complete an ordinary workday and workweek without undue interruption; work in coordination with others if such work was a small part of his job description; and deal adequately with change in a low-stress environment.

In a consultative examination conducted on September 15, 2008 to assess Remick's eligibility for state disability benefits, psychologist Michael Schneider, Psy.D, found that Remick would have frequent task performance loss because of inconsistent memory and concentration.  He would require repetition of instructions, but would be able to understand and carry out short and simple instructions.  Dr. Schneider diagnosed him with 294.9 Cognitive Disorder Not Otherwise Specified[11] and recommended further assessment to determine the extent of his cognitive problems.

---

[11] 294.9 Cognitive Disorder Not Otherwise Specified is a "category [] for disorders that are characterized by cognitive dysfunction presumed to be due to the direct physiological effect of a general medical condition that do not meet criteria for any of the specific deliriums, dementias, or amnestic disorders listed in this section . . . ."  Diagnostic &

In addition to state consultant examinations, Remick underwent a neuropsychological evaluation at the DHMC on June 10, 2010, upon referral by Dr. Strobel.  The behavioral observation was that during testing, Remick seemed somewhat lethargic and gave up rather quickly on more difficult items. Embedded validity indicators suggested that he had difficulty maintaining an optimal level of effort throughout the day, and the examiners felt that the test results may have underestimated his maximal level of cognitive functioning.  The results revealed impaired and borderline raw score ranges in attention/concentration, memory, and learning areas.  The examiners stated that it was difficult to characterize the nature and extent of Remick's cognitive impairment, but that for the most part his performance was generally consistent with baseline estimates of functioning, with greater difficulties in verbal fluency and visual learning and memory.  They recommended adding more structure to Remick's day and advised him to take responsibility for simple domestic chores.  They stated that Remick had mild comprehension difficulties, and would perform best when complex novel tasks were broken down into single steps for him to complete sequentially, as he reported difficulty multitasking.  They stated that those working with him should be

---

Statistical Manual of Mental Disorders: DSM-IV-TR at 179 (4th ed. 2000).

encouraged to speak slowly, use concrete terms, and be brief and to the point.  The examiners also felt that Remick may benefit from repeating important information back in his own terms to aid in comprehension and later recall.

## C.  **Administrative Proceedings**

Remick's claim for supplemental social security benefits was denied at the initial level on July 18, 2008.  He requested a hearing, which was held on April 14, 2010.  Remick attended the hearing via video and testified.  He was represented by counsel.  A vocational expert also testified.

The ALJ issued a decision denying Remick's claim on July 6, 2010.  The ALJ found that Remick had the following severe impairments: neurogenic bladder, dysthymic disorder, and anxiety disorder.  The ALJ found that Remick's diabetes mellitus and atrial fibrillation were non-severe as defined by the Social Security Act.  The ALJ also found that Remick retained the residual functional capacity ("RFC") to perform light, routine, and repetitive work in a low-stress environment, with certain limitations in lifting weight; standing, walking, and sitting; and dealing with the public and other employees.  The ALJ gave limited weight to Dr. Strobel's opinion that Remick's combined impairments precluded him from working full-time, finding that Dr. Strobel's opinion was not consistent with his own treatment

notes and the medical evidence as a whole.  Based on those
findings and the vocational expert's opinion, the ALJ concluded
that Remick could do jobs that existed in significant numbers in
the national economy, and that his exertional and non-exertional
limitations had little or no effect on the light unskilled
occupational base.  Therefore, the ALJ found that Remick was not
disabled for the purposes of his social security application.

On July 6, 2010, the Decision Review Board ("DRB") selected
Remick's claim for review.  On October 12, 2010, he was notified
that the DRB did not complete the review of his claim during the
time allowed, rendering the ALJ's decision the final decision of
the Commissioner, subject to judicial review.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), I am authorized to review the
pleadings submitted by the parties and the transcript of the
administrative record and enter a judgment affirming, modifying,
or reversing the "final decision" of the Commissioner.  My
review is limited to determining whether the ALJ used "the
proper legal standards and found facts [based] upon the proper
quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d
652, 655 (1st Cir. 2000).

The findings of fact made by the ALJ are accorded deference
as long as they are supported by substantial evidence.  Id.

17

Substantial evidence to support factual findings exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.'" Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).  If the substantial evidence standard is met, factual findings are conclusive even if the record "arguably could support a different conclusion." Id. at 770.

Findings are not conclusive, however, if they are derived by "ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ is responsible for determining issues of credibility and for drawing inferences from evidence on the record.  Ortiz, 955 F.2d at 769.  It is the role of the ALJ, not the court, to resolve conflicts in the evidence.  Id.

The ALJ follows a five-step sequential analysis for determining whether an applicant is disabled.  20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  The applicant bears the burden, through the first four steps, of proving that his impairments preclude him from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  At the fifth step, the ALJ determines whether work that the claimant can do, despite his impairments, exists in significant numbers in the national economy and must

produce substantial evidence to support that finding.   Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

### III.   ANALYSIS

Remick moves to reverse and remand the decision denying his application for benefits on the grounds that the ALJ failed to consider the combined effect of Remick's impairments in determining Remick's RFC and gave improper weight to the opinion of his treating physician, Dr. Strobel.[12]   In response, the Commissioner argues that the ALJ appropriately considered all the relevant evidence and that her decision is substantially supported by the record.

**A.   The Combined Effect of Remick's Multiple Impairments**

Remick contends that the ALJ erred because she did not consider the combination of his physical and psychological impairments in assessing his residual functional capacity.   This contention is without merit.

---

[12] In his memorandum of law, Remick divides his challenge into three separate arguments: (1) the ALJ failed to consider the combined effects of Remick's impairments on his ability to work; (2) the ALJ gave insufficient weight to the opinion of his treating physician, Dr. Strobel; and (3) as a result of failing to consider his combination of impairments and Dr. Strobel's opinion, the ALJ erred in finding that Remick retained RFC to perform full-time work.   Pl.'s Mem. of Law in Supp. of Mot. to Reverse, Doc. No. 7-1.   Given that his third argument is subsumed within the first two, I do not address it separately.

In determining whether a claimant is disabled, an ALJ must consider "the combined effect of all of a claimant's impairments." McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1126 (1st Cir. 1986) (citing 42 U.S.C. § 423(d)(2)(C)); see also 20 C.F.R. § 404.1520(a). It is "simply a matter of common sense that various physical, mental, and psychological defects, each non-severe in and of itself, might in combination, in some cases, make it impossible for a claimant to work." McDonald, 795 F.2d at 1127. Thus, in assessing a claimant's ability to work, the ALJ should not disregard individual, non-severe impairments where the claimant's collective impairments are severe.

Here, the record does not support Remick's assertion that the ALJ failed to consider the combined effect of his multiple impairments. At Step Two of the sequential analysis, the ALJ determined that Remick's neurogenic bladder, dysthymic disorder, and anxiety disorder were severe impairments, but that his diabetes mellitus and atrial fibrillation were not severe. She then plainly took into consideration both his severe and non-severe impairments when determining the level and type of exertion he was capable of performing. Specifically, the ALJ "recogniz[ed] that the claimant does have a combination of both physical and mental impairments, which credibly limit him to a range of light, unskilled work," but she found "a lack of

evidence of any medically documented objective findings which would preclude him from performing [light] level of work activity on a regular and continuing basis . . . ."  (Tr. 19).  I conclude that the ALJ's analysis sufficiently took into account the combined effect of Remick's impairments and is supported by substantial evidence.  See Raney v. Barnhart, 396 F.3d 1007, 1011 (8th Cir. 2005) (rejecting the argument that ALJ failed to consider impairments in combination where he specifically stated he had); Lalime v. Astrue, No. 08-cv-196-PB, 2009 WL 995575, at *8 (D.N.H. April 14, 2009) (rejecting the argument that ALJ failed to account for the claimant's obesity where it was "clear that he considered that condition when evaluating her claim").

The ALJ's decision detailed her findings of both the physical and mental impairments and their effect on Remick's functional capacity.  First, she evaluated Remick's physical conditions, detailing the medical evidence extensively.  In determining that Remick retained light residual functional capacity, the ALJ considered as one factor sleep disturbance and daytime fatigue resulting from Remick's need to catheterize himself once every four hours due to bladder dysfunction.  Consistent with the vocational expert's testimony, the ALJ found that Remick would be able to catheterize himself during normally scheduled breaks in an eight-hour workday.  She found no

evidence of additional symptoms related to Remick's bladder impairments that would preclude him from performing light-exertion work. Apart from relatively infrequent UTIs (two in a two-year period), the record reveals no additional bladder-related symptoms.

The ALJ also found that Remick's medical records revealed no evidence of any symptoms related to either diabetes mellitus or atrial fibrillation that warranted further reduction in his RFC. There is substantial evidence in the record that supports the ALJ's finding that both conditions were controlled with medication and generally asymptomatic since early 2008. Specifically, Dr. Strobel's notes indicate that, with the exception of two episodes of hypoglycemia, Remick's diabetes was generally well controlled, especially when Remick complied with the prescribed diet. As for atrial fibrillation, the condition was similarly stabilized with medication since April 2008 and Remick's heart rate was normal throughout the relevant period of time. Remick did experience leg edema, a symptom associated with atrial fibrillation, at times between May and August 2008, but subsequent examinations found no edema. Although Remick testified that he was experiencing shortness of breath related to his heart impairment, the ALJ instead credited his treatment providers' records noting his denials of this symptom, as well as any other cardiac-related symptoms. Given that his medical

records indicate no other symptom associated with either diabetes or atrial fibrillation, the ALJ's decision not to further reduce Remick's RFC is supported by substantial evidence.

The ALJ also considered how Remick's mental disorders affect his RFC and concluded that he was able to perform routine, repetitive work in a low-stress environment that requires only brief, occasional interaction with the public and only occasional interpersonal interaction with other employees. The ALJ noted that treatment records describe Remick's depression as "mild."  As for the claim that Remick suffered from diminished cognitive functioning, the ALJ noted that the record revealed only mild deficiencies and accounted for those deficiencies in deriving Remick's RFC.

There is substantial evidence in the record to support the ALJ's decision that Remick's psychological conditions did not prevent him from full-time work.  Dr. Strobel's notes indicate that Remick's depression improved with Prozac and that only mild afternoon irritability persisted.  The neuropsychological evaluation Remick completed at the DHMC failed to reveal substantial cognitive deficiencies, with the examiners noting only mild comprehension difficulties.  The examiners stated that his performance was generally consistent with baseline estimates of functioning, with greater difficulties noted in verbal

fluency and visual learning and memory.  The ALJ also gave
substantial weight to the evaluation of Dr. Stenslie, a state
agency consultant who reviewed SSA evidence, that Remick could
work in a low-stress environment.

The ALJ's findings are conclusive if supported by
substantial evidence and should be upheld even in those cases in
which the reviewing court, had it heard the same evidence de
novo, might have found otherwise.  Lizotte v. Sec'y of Health &
Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).  A review of
the medical record in this case reveals that the ALJ's
conclusions in assessing Remick's RFC included analysis of all
of his impairments.  I therefore find that her conclusion that
Remick's combination of physical and mental impairments did not
preclude him from full-time work was supported by substantial
evidence, and should be affirmed.

**B.    Weight Given to Treating Physician's Opinion**

Remick next argues that the ALJ failed to give proper
weight to the opinion of Remick's treating physician, Dr.
Strobel, that Remick was limited to part-time work.

A treatment provider's opinions must be given controlling
weight if the "treating source's opinion on the issue(s) of the
nature and severity of [the applicant's] impairment(s) is well-
supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ." 20 C.F.R. § 404.1527(d)(2).  The ALJ "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." Coggon v. Barnhart, 354 F.Supp.2d 40, 52 (D. Mass. 2005) (internal quotation marks and citations omitted); see 20 C.F.R. § 404.1527(d)(2).

When a treating physician's opinion is not entitled to controlling weight, the ALJ determines the amount of weight based on factors that include the nature and extent of the physician's relationship with the applicant, whether the physician provided evidence in support of the opinion, whether the opinion is consistent with the record as a whole, and whether the physician is a specialist in the field. 20 C.F.R. § 404.1527(d)(1-6).  In addition, the ALJ must give reasons for the weight given to treating physician's opinions. Id.; see also Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010).

Dr. Strobel indicated that Remick's combination of diabetes, depression, atrial fibrillation, and urinary retention preclude him from working full-time.  Significantly, Dr. Strobel did not elaborate on the basis for his opinion and merely stated

that he relied upon the functional capacity evaluation by Minshall. (Tr. 620). The ALJ concluded that Dr. Strobel's opinion was entitled to little weight because it was "inconsistent with his own treatment notes as well as with the medical evidence of record as a whole . . . ." (Tr. 19).

Dr. Strobel's opinion is inconsistent with substantial evidence in the record and therefore the ALJ was justified in according his opinion less weight. See 20 C.F.R. § 404.1527(d)(2)-(4); Ortiz, 955 F.2d at 769-70; Graham v. Barnhart, No. 02-CV-243-PB, 2006 WL 1236837, at *6 (D.N.H. May 9, 2006) (medical opinion given less weight because it was inconsistent with the record as a whole). First, Dr. Strobel's opinion is inconsistent with his objective findings. See 20 C.F.R. § 404.1527(d)(2)-(4). His treatment notes document consistent improvement in all of Remick's conditions. He noted that Remick's atrial fibrillation was well controlled with medication and generally asymptomatic. During the vast majority of examinations, there was no edema present in the extremities, and at times when Remick complained of increased edema that would recede overnight, adjustments in medication resulted in improvement. Further, except on rare occasions, Remick reported no functional limitations, as he was able to walk and exercise without difficulty. Similarly, Dr. Strobel's notes indicate good management of diabetes during the relevant period of time.

26

Except for two instances of hypoglycemia and a two-month period when Remick's glucose was not well controlled, at least in part due to diet, the majority of Dr. Strobel's treatment notes indicate that the diabetes was under control. Although Remick must use a catheter every four hours due to bladder dysfunction, resulting in some sleep interruption and daytime fatigue, Dr. Strobel's notes indicate no fatigue during examinations and no other problems using the device. Remick did experience two UTIs during the two-year period that Dr. Strobel treated him, but both infections were successfully treated with medication. Lastly, Dr. Strobel described Remick's depression as mild and improved on medication.

Second, Dr. Strobel's opinion that Remick is limited to part-time work is not entirely consistent with the results of the functional capacity evaluation that Remick completed with Minshall. During the evaluation, Remick was active for five hours without need for much rest and yet had not reached his physical maximum. Minshall also noted that Remick was not entirely reliable in his disability reporting. Moreover, although Minshall concluded Remick could perform part-time work, he did not suggest that this was a permanent limitation. To the contrary, Minshall noted that Remick's work hours should be increased as tolerated and suggested a work-hardening program and vocational rehabilitation. Lastly, none of the mental

27

health providers who examined Remick stated that he could only
perform part-time work.  Rather, their assessments noted his
ability to function in low-stress work environments.

The ALJ's decision not to credit Dr. Strobel's opinion is
further bolstered by the fact that Dr. Strobel neither discussed
his reasons for the assessment nor cited objective medical
testing or records in support of his assessment, apart from
noting that he relied upon the functional capacity evaluation.
(Tr. 620).  "[A] medical opinion should be given less weight if
it does not include relevant evidence to support the opinion,
particularly medical signs and laboratory findings." Graham,
2006 WL 1236837, at *6 (internal quotation marks and brackets
omitted); see 20 C.F.R. §§ 404.1527(d)(2)-(3).  While other
aspects of the record support Dr. Strobel's opinion, the fact
remains that his opinion is also inconsistent with substantial
evidence in the record.  As a result, it was within the ALJ's
discretion to afford his opinion less weight.  I cannot upset
this decision.  See Lizotte, 654 F.2d at 128 ("[T]he resolution
of conflicts in the evidence and the determination of the
ultimate question of disability is for [the ALJ], not for the
doctors or for the courts.") (quoting Rodriguez, 647 F.2d at
222).

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Remick's motion to reverse the decision of the Commissioner (Doc. No. 7) is denied.  The Commissioner's motion to affirm (Doc. No. 9) is granted. Accordingly, the clerk shall enter judgment and close the case.

SO ORDERED.


/s/ Paul Barbadoro_____
Paul Barbadoro
United States District Judge

October 21, 2011


cc:   Bennett B. Mortell, Esq.
      T. David Plourde, Esq.